**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA MELENDEZ and MAYRA HERNANDEZ, on behalf of themselves and other Plaintiffs similarly situated, | ) ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | Judge |
| v. | ) | |
| | ) | **Jury Trial Requested** |
| SAINT ANTHONY HOSPITAL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Maria Melendez and Mayra Hernandez, on behalf of themselves and all others similarly situated, through their attorneys, Barlow, Kobata & Denis LLP, for their Complaint against Defendant Saint Anthony Hospital, states as follows:

## NATURE OF ACTION

1.       This lawsuit arises under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA")*,* the Portal to Portal Act, 29 U.S.C. § 251 *et seq.,* and the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), for Defendant's failure to pay overtime wages to Plaintiffs and a class of similarly situated employees.  With respect to Plaintiff  Melendez this lawsuit also arises under the Americans with Disabilities Act, as amended, 42 U.S.C. #12101 et seq.  (herein the "ADA"), the Family Medical Leave Act, 29 U.S.C. #2601 et seq. (herein, the "FMLA"), and the Age Discrimination and Employment Act, 29 U.S. C. 621 et. seq. ( herein the "ADEA").

## JURISDICTION AND VENUE

2.       Federal jurisdiction arises under the provisions of the FLSA, 29 U.S.C. § 201 *et. seq.*, including §§ 206 and 207, the Portal-to-Portal Act, 29 U.S.C. § 251 *et. seq.*, the ADA, the

FMLA, the ADEA, and 28 U.S.C. §§ 1331 and 1343. There is supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.  Venue lies in the Northern District of Illinois Eastern Division in that the Plaintiffs are residents of this District and Division, Defendant is engaged in business in this District and Division, and a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District and Division.

**PARTIES**

4.  Defendant Saint Anthony Hospital (herein "Defendant") operates a hospital located in at 2875 W. 19th Street in Chicago, Illinois.

5. The Plaintiffs Maria Melendez and Mayra Hernandez are residents who reside in the Northern District of Illinois and have performed work for Defendant on an hourly basis and were non-exempt employees of the Defendant.

6.  At all relevant times herein, Plaintiffs, and all other unnamed Plaintiffs of the class, known and unknown (hereinafter referred to as "members of the Plaintiff Class") are either former or current hourly employees of Defendant.

IV.  **COLLECTIVE ACTION ALLEGATIONS**

7.  Pursuant to 29 U.S.C. § 216 (b), this action may be maintained by the Plaintiff Class, or anyone for and on behalf of themselves and other Plaintiffs similarly situated, who have been damaged by Defendant's failure to comply with 29 U.S.C. § 206 *et. seq.* and § 251 *et. seq.*

8.  There exist past and present employees of the Defendant who are similarly situated to the named Plaintiffs in that those similarly situated employees were hourly employees, have performed the same or similar job duties as the named Plaintiffs and have been compensated in the same or similar manner as the named Plaintiffs.

9.      During their employment Plaintiffs were paid on an hourly basis and performed non-exempt work. Plaintiffs and similarly situated employees who were paid on an hourly basis, including hourly employees who performed job duties like admitting, outpatient registration, emergency room registration, patient access representatives, and similar hourly jobs, were subject to common personnel policies, including the Defendant's same policies regarding being paid on an hourly basis, working through their lunch, and working off the clock.

10.      Defendant had and has a common policy and practice regarding the payment of wages and overtime wages for all of its hourly employees.

11.      For all members of the Plaintiff Class to become fully aware of their right to join this cause of action, a certain period of time as determined by this Court is necessary to send notice to the entire Plaintiff Class, as well as certain additional time for those members to file consent forms with this Court as provided by 29 U.S.C. § 216(b).

12.      Pursuant to 29 U.S.C. § 216(b), the Court should, in addition to any judgment awarded the Plaintiff Class, allow reasonable attorneys' fees and costs of the action to be paid by Defendant.

13.      In order to bring this cause of action, it has been necessary for the named Plaintiffs and will become necessary for the other members of the Plaintiff Class, to employ attorneys to secure a judgment due them with regard to unpaid overtime compensation.

**COUNT I**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT**

**FACTUAL ALLEGATIONS**

14.      Paragraphs 1-13 are re-alleged and incorporated as though set forth fully herein.

15.      The Plaintiffs and all other unnamed Plaintiffs of the class, known and unknown ("Plaintiff Class") are either present or past employees of the Defendant.

16.     At all pertinent times to this cause of action, Plaintiffs and all other members of the Plaintiff Class, known and unknown, were employed by Defendant, said employment being integral and indispensable to Defendant's business.

17.     At all pertinent times Defendant has continuously been an "employer in an industry affecting commerce" within the meaning of the FLSA, 29 U.S.C. § 201 *et seq*.

18.      Each of the Plaintiffs have signed a Consent to Become a Party Plaintiff under the FLSA,  copies of which are attached hereto as Exhibit A.

19.     During their employment, Plaintiffs and the Plaintiff Class  regularly worked more than forty (40) hours during the workweek and were not paid at a rate of one and one-half times their regular hourly rate for those hours worked over forty (40).

20.     Plaintiffs and the Plaintiff Class were subject to the same personnel policies and overtime policies, including the policy to require employees to work off the clock, to work through their lunch, and to refuse to pay them overtime for all the hours they worked over 40 hours in a workweek.

21.     Plaintiffs and the Plaintiff Class were not always paid for all of the overtime hours they worked.

22.     Defendant has employed members of the Plaintiff Class, including the Plaintiffs, to perform work for it, but has failed to pay them at a rate of one and one-half times their regular hourly rates for hours worked over forty (40) hours in a workweek pursuant to the requirements of the FLSA.

23.     Pursuant to the FLSA, 29 U.S.C. § 201 *et. seq.,* and the Portal-to-Portal Act 29 U.S.C. § 251 *et. seq.*, Plaintiffs, and all other Plaintiffs similarly situated, known and unknown, are entitled to overtime pay at a rate of one and one-half times their regular hourly rate for all hours

worked over forty (40) in a single workweek during the two (2) years preceding the filing of this Complaint.

24.     Defendant's failure to pay overtime pay at a rate of one and one-half times the regular hourly rate for all overtime hours worked by Plaintiffs and the Plaintiff Class is a violation of the FLSA.

25. The Defendant and its Managers, including Susan Tavrides, whose title was Manager Patient Access, were aware that Plaintiffs and other class members worked in excess of 40 hours per week and were working off the clock, including working through their lunch.

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, known and unknown, respectfully requests this Court to enter an order as follows:

A.     the Court determine the rights of the parties and direct the Defendant to pay for all overtime hours worked and wages paid to the Plaintiffs;

B.     awarding a judgment equal to the amount of all unpaid compensation for the two (2) years preceding the filing of this Complaint, according to the applicable statute of limitations;

C.     awarding Plaintiffs' reasonable attorneys' fees and costs incurred as a result of Defendant's violation of the FLSA; and

D.     for such other, additional, and further relief as the Court deems appropriate under the circumstances.

## COUNT II
## WILLFUL VIOLATION OF THE FAIR LABOR STANDARDS ACT

26.     Paragraphs 1-25 are re-alleged and incorporated as though set forth fully herein.

27.     Defendant has, both in the past and presently, willfully failed to pay the Plaintiffs and the class they represent for all overtime hours worked at a rate of one and one-half times their

regular hourly rate as described above, despite the fact that Defendant knew, or should have known, of the requirements of the FLSA.

28.     Defendant continues a pattern of deliberate, intentional, and willful violation of the FLSA.

29.     Pursuant to the FLSA, Plaintiffs and the class they represent are entitled to compensation for all overtime hours worked in any given week at a rate of one and one-half times their regular hourly rate during the three (3) years preceding the filing of this Complaint.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, known and unknown, respectfully requests this Court to enter an order as follows:

A.     awarding a judgment equal to the amount of all unpaid overtime compensation for one (1) additional year, totaling three (3) years preceding the filing of this Complaint;

B.     awarding prejudgment interest with respect to the total amount of unpaid overtime compensation;

C.     awarding Plaintiffs' reasonable attorneys' fees and costs incurred as a result of Defendant's violation of the FLSA; and

D.     for such other, additional, and further relief as the Court deems appropriate under the circumstances.

**COUNT III**
**LIQUIDATED DAMAGES**

30.     Paragraphs 1-29 are re-alleged and incorporated as though set forth fully herein.

31.     In denying Plaintiffs and the class they represent compensation at a rate of one and one-half their regular hourly rate for all hours worked over forty (40) in a workweek, Defendant's acts were not based upon good faith or reasonable grounds.

32.     The Plaintiffs and the class they represent are entitled to liquidated damages equal to the amount of unpaid compensation pursuant to 29 U.S.C. § 216.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, known and unknown, respectfully request this Court to enter an order as follows:

A.     awarding liquidated damages equal to the amount of all unpaid overtime compensation;

B.     awarding Plaintiffs' reasonable attorneys' fees and costs incurred as a result of Defendant's violation of the FLSA; and

C.     for such other, additional, and further relief as the Court deems appropriate under the circumstances.

### COUNT IV
### SUPPLEMENTAL STATE COURT CLAIM
### ILLINOIS MINIMUM WAGE LAW, 820 ILCS SECTION 105 *et. seq.*

33.     Paragraphs 1-10, 13, 15-21, and 25 are re-alleged and incorporated as though set forth fully herein.

34.     There exists a statute called the Illinois Minimum Wage Law, 820 ILCS § 105 *et. seq.*, which requires employers to pay to employees at a rate of one and one-half times their regular hourly rate for all hours worked over forty (40) in a workweek.

35.     This Court has jurisdiction over the Illinois state claim by virtue of 28 U.S.C. § 1367.

36.     At all relevant times herein, Defendant was an employer as defined in the Illinois Minimum Wage Law, 820 ILCS 105/3(c), and Plaintiffs were  employees within the meaning of that Act.

37.     Pursuant to 820 ILCS 105/4a, for all weeks during which Plaintiffs worked, they were entitled to be paid at a rate of one and one-half times their regular hourly rate for all hours they worked over forty (40) in a single workweek.

38.     Defendant violated the Illinois Minimum Wage Law by refusing to compensate Plaintiffs for all overtime hours worked at a rate of one and one-half times their regular hourly rate. Defendant failed and refused to pay Plaintiffs their overtime pay.

39.     Pursuant to 820 ILCS 105/12(a), Plaintiffs are entitled to recover unpaid overtime compensation for three years prior to the filing of this suit, plus punitive damages in the amount of two percent (2%) per month of the amount of under payments.

40.     The aforementioned Illinois statute provides for a statute of limitations of three years from the date of the underpayment of the wage, without qualification.

41.     The aforementioned Illinois statute also provides for Plaintiffs to recover the amount of the wage underpayment as well as costs and reasonable attorneys' fees as may be allowed by the Court.

42.     Defendant's failure to pay Plaintiffs overtime compensation for all hours worked over forty (40) in a workweek is a violation of the Illinois Minimum Wage Law.

WHEREFORE, Plaintiffs respectfully request this Court to enter an order as follows:

A.      a judgment in the amount of all unpaid wages for the three years preceding the filing of this lawsuit;

B.      punitive damages pursuant to the formula set forth in 820 ILCS 105/12(a);

C.      awarding prejudgment interest on the unpaid overtime wages in accordance with 815 ILCS 205/2;

D.      awarding Plaintiffs' reasonable attorney's fees and costs incurred as a result of Defendant's violation of that Act;

E.      that the Court determine the rights of the parties and direct the Defendant to pay for all hours worked and wages paid to Plaintiffs during the relevant time period; and

F.      for such other, additional, and further relief as the Court deems appropriate under the circumstances.

**COUNT V (Americans With Disabilities Act)**

43.     Paragraphs 1-5 are re-alleged and incorporated as though fully set forth herein.

44.     This lawsuit arises under the Americans With Disabilities Act, as amended, 42 U.S.C. §12101 et seq. (herein, the "ADA"). Plaintiff Maria Melendez is a former employee of the Defendant.     Melendez is seeking damages and injunctive relief to redress employment discrimination practices, Defendant's failure to accommodate her, and retaliation by Defendant for requesting an accommodation under the ADA and Illinois Human Rights Act.

45.     Federal jurisdiction arises under the provisions of the ADA, and federal question jurisdiction, 28 U.S.C. §1331 and §1343. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 based on federal question jurisdiction.

46.     Pursuant to 28 U.S.C. §1391, venue lies in the Northern District of Illinois in that Melendez is a resident in this District, Defendant has been engaged in a business in this District, and a substantial part of the alleged events or omissions giving rise to the claims occurred in this District.

47.     Since at least 2015 Defendant has been authorized to do business in Illinois, has been conducting business in Chicago, Illinois, and has continuously been and is now an employer engaged in interstate commerce or an activity affecting commerce, and the Defendant was an "employer" within the meaning of the ADA.

48.     Since at least 2015 Defendant has employed more than two hundred employees within the meaning of the ADA. In 2015, 2016, and 2017 Melendez was an "employee" within the meaning of the ADA.

## PROCEDURAL BACKGROUND

49.     On November 6, 2017 Melendez filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging violations of the ADA. Melendez timely filed her Charge of Discrimination against Defendant with the EEOC alleging violations of the ADA. The EEOC Charge of Discrimination that Plaintiff Melendez filed was cross-filed with the Illinois Department of Human Rights. The Charge of Discrimination that Plaintiff Melendez filed was timely filed with the Illinois Department of Human Rights.

50. On April 11, 2018, the EEOC issued Plaintiff Melendez a Notice of Right to Sue with respect to her pending Charge of Discrimination that was filed against Defendant. A true and correct copy of the EEOC Notice is attached hereto as Exhibit B and incorporated herein. This action has been timely filed by Plaintiff Melendez within ninety (90) days of her receipt of the EEOC's Notice of Right to Sue. Plaintiff Melendez has fulfilled all conditions precedent to the institution of this lawsuit against the Defendant under the ADA.

## FACTUAL BACKGROUND

51.     Plaintiff Melendez worked for the Defendant between November 11, 1991 and December 10, 1998. She was rehired on April 16, 2001. When she was rehired in 2001, the Defendant used her April 16, 2001 hire date as her seniority date. In 2016 and 2017 the Defendant used a "Seniority list." That Seniority list listed Melendez as the Registration Associate with the longest seniority date. In 2016 and 2017 the Defendant maintained and distributed to its Registration Associates a seniority list. That seniority list included approximately eighteen (18) employees and listed Melendez as having the most seniority.

52.     Melendez was qualified to perform her job duties in 2015, 2016, and 2017. At all pertinent times between January 1, 2015 and October 27, 2017 Melendez performed her job duties in a satisfactory manner.

53.     For several years Melendez worked the third shift from 10:30 PM to 7:00 AM registering hospital patients. Particularly on Friday nights and on weekends, ambulances frequently brought patients to the Defendant, and there were numerous walk in patients. The Defendant had a very active Emergency Room, with ambulances bringing in patients clamoring to be registered and admitted.

54. The Defendant frequently understaffed the admissions and registration staff scheduled to work. On many occasions the number of patients asking to be registered and admitted was so high that Melendez was unable to take her lunch, and to register the patients coming into the Defendant she worked through her lunch. Oftentimes, the Defendant instructed Melendez to clock out at 7:00 AM, but then insisted that she continue working off the clock and without getting paid to finish her paper work and get all the signatures signed. For example, for baby deliveries, Melendez needed to get staff to sign three forms for the mother and three forms for the baby, and

Melendez oftentimes continued working after she clocked out trying to obtain the required signatures, consents, and HIPAA form signatures, scanning the signatures for the mother and baby, separating the forms for the baby and mother's accounts, and filing the forms.

55. On March 30, 2016 Melendez, while working at the Defendant, suffered chest pains, heart palpitations, and shortness of breath. She was admitted to and treated by the Defendant's emergency room. She was treated by several doctors involving her heart, including by a cardiologist. Between March 30 and 31, 2016 she was treated by the Palos Health Hospital involving her heart condition. On June 2, 2016 she was treated for hypothyroidism and PSVT, which is called paroxysmal supraventricular tachycardia. In December 2016 she received treatment regarding a cardiac arrhythmia condition. Defendant and its Managers were aware of Melendez's medical conditions and treatments.

56. In approximately April 2016 Melendez's doctor recommended that Melendez, due to her medical conditions, change shifts from the third shift to the first shift. In August 2016 Melendez told Susan Tavrides, Defendant's Manager, that she had heart-related medical issues and hypothyroidism, that her doctor recommended that she change her shift from the third shift to the first shift, and that she needed and was requesting an accommodation to transfer to a different shift other than the third shift to which she was assigned. Tavrides told Melendez that she was aware of Melendez's medical conditions, that she was aware that Melendez's doctor and Melendez had requested an accommodation, and that she would accommodate her. However, Tavrides interposed objections to transferring Melendez to the first shift and failed to accommodate her.

57. Although aware of Melendez's request for an accommodation, thereafter from the late Summer of 2016 dating to late October 2017, even though there were job openings for which

Melendez was qualified and to which she could have transferred, the Defendant and Tavrides refused to accommodate Melendez.

58. Between the Summer of 2016 and October 2017 openings occurred on the first shift for which Melendez was qualified, but she was not accommodated, and she was neither transferred to those positions nor offered the opportunity to transfer to or apply for those positions.

59. By requesting to transfer to the first shift, Melendez requested an accommodation within the meaning of the ADA and Illinois Human Rights Act, her accommodation request was reasonable, and approving her accommodation request did not create an undue hardship on Defendant and would not have created an undue hardship on Defendant.

60. As of the Summer of 2016, Defendant and Tavrides were each aware that Melendez had requested an accommodation within the meaning of the ADA and Illinois Human Rights Act, that her request was reasonable, and that her accommodation request did not create an undue hardship on Defendant.

61. As of the Summer of 2016 Defendant and Tavrides were each aware that Melendez had requested an adjustment in her workplace involving a transfer to the first shift, that she had requested an adjustment in her workplace involving a transfer to the first shift because of her medical conditions, and the Defendant and Tavrides each had enough information about Melendez's medical conditions and requested accommodations to determine whether to approve her accommodation request.

62. Melendez was able to perform the essential functions of her job with or without a reasonable accommodation.

63. Approving Melendez's request to transfer to the first shift would not have been prohibitively expensive for Defendant and would not have been unduly disruptive to the ordinary

conduct of its business. Approving Melendez's accommodation request to transfer to the first shift did not involve an undue hardship on Defendant and would not have involved an undue hardship on it.

64.    Approving Melendez's accommodation request would not have fundamentally altered the nature of the Defendant's business, did not involve an undue cost or extensive or substantial disruption to the nature or operation of its business, or a fundamental alteration to the nature or operation of its business.

65. On May 16, 2017 at 3:36 PM Tavrides sent an email that, with respect to the subject of "Holiday Schedule," in part, stated: "Prior to my arrival here, the practice for Holiday coverage was each person worked every other holiday – If you worked 4th of July, you were off Labor Day etc. I asked for suggestions on how we should handle the upcoming holidays. Since I did not get any responses, I decided to go with this process. Each person has to pick 2 holidays. One summer (Memorial Day, Fourth of July and Labor Day) and one Winter . . .You should pick from the hours that you normally work. . . . You pick in order of Seniority. See attached list."

66.  On May 16, 2017 at 5:07 PM Tavrides sent an email that, with respect to the subject of "Holiday Schedule," in part stated: "There seems to be much confusion on this. As you can see from the Seniority list, Maria Melendez has been here the longest and she will pick first for the 3rd shift and so on." and "Maria, please pick your two holidays and send me. . Ayme and I will be coming around in order of your seniority and let you pick the days you want."

67. Defendant circulated a holiday schedule that allowed employees to pick the holiday days that the employee would not be working.  One of the days that Melendez picked to not work was July 4, 2017, a Tuesday. On April 12, 2017 Melendez had submitted a PTO/RDO Request

Form requesting to take PTO Time to be off between June 27 and July 3, 2017, and Defendant approved that PTO Time.

68. On Monday, July 3, 2017, while on vacation in Texas, Melendez fractured her right big toe. That fracture was very painful and limited her ability to walk. On July 3, 2017 she called her doctor, Dr. Helen Gue, reported her injury to Dr. Gue about her big toe, and requested that Dr. Gue treat her. Dr. Gue told Melendez to not walk on her toe or foot, to not work, and scheduled an appointment for her for Thursday, July 6, 2017. On Thursday, July 6, 2017 Melendez was examined and treated by Dr. Gue. Dr. Gue told Melendez that she needed to see an orthopedist Dr. Goldflies, and Melendez scheduled an appointment with Dr. Goldflies for Saturday, July 8, 2017. On July 10, 2017, Melendez was examined and treated by Dr. Goldflies. Dr. Goldflies sent her for x-rays. Dr. Goldflies diagnosed her medical condition as a fracture of her toe, and recommended that she be off of work and on a leave of absence until August 15, 2017.

69. In the interim, on the evening of Tuesday, July 4, 2017, Amy Nava from the Defendant called Melendez and asked if she was coming in to work that evening, July 4th. Melendez told Amy Nava that she had exercised her seniority and picked July 4th to be off and, moreover, while on vacation she had broken or fractured her right big toe, that she was in a lot of pain, that she had talked to Dr. Gue, that Dr. Gue had told her not to work and to stay off of her foot and toe, and that she had scheduled an appointment with Dr. Gue for Thursday, July 6, 2017, that she was not able to work because of her injured foot and toe, and she asked to be excused from work so that she could be treated by Dr. Gue. Shortly after speaking to Amy Nava, Tavrides called Melendez, and Melendez made the same latter statements to Tavrides. As to Melendez's request to be off of work so that Melendez could be treated for the injury to her foot or toe and to see Dr. Gue, Tavrides said that was okay.

70. On Thursday July 6, 2017 Dr. Gue examined and treated Melendez. Dr. Gue gave Melendez a doctor's note dated July 6, 2017 that stated, among other things, that Melendez had injured her "rt big toe. Unable to work since 7/3/2017 up to present" and "need to see ortho Dr. Goldflies ASAP (Sat)." Dr. Gue placed an order that Melendez undergo an xray of her right foot, and he noted in his Clinic Information that she had "R/O Fracture." On July 6th Dr. Gue faxed a copy of her July 6th doctor's note to Tavrides. Defendant and Travrides received and reviewed a copy of Dr. Gue'e July 6th doctor's note on July 6th.

71. After receiving Dr. Gue's July 6th doctor's note, on the morning of July 7, 2017 Tavrides told Melendez that she had checked Melendez's FMLA and medical records, that Melendez had had a prior FMLA absence in 2015 involving an injury to her other big toe, that Melendez had a pattern of FMLA absences, and that because of that pattern of FMLA absences she was suspending Melendez without pay for two days. The Defendant suspended Melendez for two days without pay in July 2017. Tavrides gave Melendez a Corrective Action and Education Form that was dated July 7, 2017 that checked the box labeled "Step 3: Final Warning/Suspension," stated that "Attendance Policy #405 no call no show" was the policy violation, and in the "facts" section stated "was scheduled to work on the 4th of July Holiday no call no show."

72. Mercedes Garcia was hired by the Defendant on October 15, 2013. Garcia did not have a disability and had not requested a reasonable accommodation because of any disability or medical condition.

73. On the morning of July 7, 2017, when Tavrides arrived at work, Garcia was asleep during work time. Tavrides saw Garcia asleep. Tavrides told Melendez that she saw Garcia sleeping on the job. Defendant's policies and practices prohibited sleeping on the job, and the

Defendant's policy and practice was to automatically fire an employee who was observed sleeping on the job.  Tavrides observed Garcia sleeping on the job.  Tavrides did not either fire Garcia, discipline her, or issue Garcia any type of  written disciplinary warning.

74. On September 27, 2017 the Defendant posted a vacancy for a Patient Access Representative which was on the day shift between 7:00 AM and 3:30 PM. Melendez was qualified for that position, and Melendez applied for that vacancy.  Defendant could have accommodated Melendez by transferring her to that position, but Defendant did not do so.

75. Before Tavrides posted the job she told Melendez that only seniority would be the determining factor in deciding who to select.  Tavrides was the decision maker, and Tavrides chose Garcia.  On October 24, 2017 Tavrides informed Melendez that she was not chosen because she had been given a suspension on July 7, 2017 and was currently on a "corrective action" and, hence, was disqualified from moving into another position.

76. Tavrides sent Melendez an email which stated, in part, the following: "I have been meaning to come see you in person but, it has been challenging. My husband and I have been sharing a car while his is in the shop, so it has been difficult for me to come in while you are here. I wanted to follow up with you on your interest in the Financial Counselor position.  In my original email, I stated it would be based on Seniority and any Corrective Action.  While you do have the seniority, your Corrective action will prevent you from moving into another position.  I will be sending out an announcement today that Mercedes will be moving into that position."

77.  After receiving Tavrides' email, Melendez sent an email to Tavrides stating that she disagreed with the corrective action that she was given, that Amy had said she would report Melendez's July 4th call-in to Tavrides, that Melendez had herself told Tavrides on July 4th that she was in severe pain due to her toe being fractured, that she could not come in because of her

17

accident, and that Dr. Gue had placed her on medical leave and faxed her doctor's note to Tavrides excusing Melendez to stay home because of her injury, that Tavrides did not follow the progressive discipline policy, that Tavrides had said the selection would only be based on seniority, and that Garcia was selected although she had numerous verbal and written complaints.

78. On Friday night October 27, 2017, Melendez arrived at work for her 10:30 PM shift. When she arrived, the emergency room was very busy. There were sixteen (16) patients already posted on the board and awaiting admission and registration. Their complaints ranged from "drowsy unusual behavior," "sore throat trouble breathing," "substance abuse," and "abd pain vomiting" to "head laceration" and "abd and chest pain." Each of the 16 patients were yelling, moaning, and pushing to be admitted.

79. Usually on a Friday night three admission employees were scheduled to work. Prior to Melendez arriving, Tavrides, although knowing that approximately 16 patients were asking to be admitted and processed and that that work situation would present a very difficult and stressful work situation for Melendez, particularly if she was the only admission employee assigned to handle that number of patients and admissions, had instructed one of the admission employees Matthew to leave early at 10:00 PM and had instructed a third admission employee Lysette, who usually came in at 10:00 PM, to delay starting until 11:00 PM. In the interim, several patients, who had been waiting several hours, loudly and angrily insisted that they be registered and admitted because they had been waiting for some time. The second shift reported to Melendez that there were only three to four beds holding, and that was left for Melendez to also follow up on. Instead of three employees handling this work, Tavrides scheduled Melendez to work there by herself.

80. Scheduling Melendez to work on a very busy Friday night in the emergency room by herself, while excusing one employee to leave early and excusing a second employee to delay coming in, and in conjunction with Defendant's prior pattern of offensive and illegal conduct, jeopardized and threatened Melendez's personal health and safety, constituted intolerable and unbearable working conditions, and constituted a constructive discharge.

81. The Defendant and Tavrides were aware of Melendez's prior health risks involving her heart problems, her heart palpitations, hypothyroidism, her shortness of breath, and her treatment for cardiac arrhythmia and her requests to be shifted to the first shift. The Defendant and Tavrides took a series of discriminatory, retaliatory, and illegal actions against Melendez and engaged in a repeated pattern of offensive and illegal conduct that subjected her to intolerable and unbearable working conditions, including, for example, denying her pay for the overtime she worked, denying her an accommodation transfer, and denying her a transfer to the first shift for the Financial Counselor job, and instructing her, in effect, to work off the clock without being paid.

82. Between March 2016 and October 27, 2017 Melendez was a qualified individual with a disability within the meaning of 42 U.S.C. #12101(2)(A), (2)(B), and 2(C) of the ADA.

83. Between March 2016 and October 27, 2017 Melendez had one or more impairments within the meaning of the ADA that substantially limited one or more of her major life activities within the meaning of the ADA. Melendez also had a record of such an impairment.

84. Melendez's impairments constituted a disability as that term is defined in the ADA.

85. At all pertinent times, Melenedez was qualified to perform the essential functions of her job, with or without a reasonable accommodation, within the meaning of the ADA and the Illinois Human Rights Act.

86.     Since at least April 2016 the Defendant was aware that Melendez had a disability within the meaning of the ADA and the Illinois Human Rights Act.

87.     Because of her disability, the Defendant discriminated against Melendez regarding her terms and conditions of employment, refused to accommodate her, constructively discharged her, and retaliated against her because she requested to be accommodated pursuant to the ADA and the Illinois Human Rights Act.

88.     The Defendant violated the ADA by discriminating against Melendez, refusing to accommodate her constructively discharging her, and retaliating against her for requesting accommodations.

89.     By its conduct alleged herein, the Defendant engaged in unlawful employment practices on the basis of the Melendez's disability and in retaliation for her requests for an accommodation. Defendant engaged in this conduct in violation of the ADA.

90. The Defendant knew and/or showed reckless disregard for whether its conduct violated the ADA. The reasons that Defendant gave for not accommodating her were false and retaliatory.

91.     The actions of the Defendant were taken deliberately and intentionally and with malice and reckless indifference to the Melendez's civil rights.

92.     The acts complained of were ratified, authorized, and permitted by the Defendant and its officers, managers, and supervisors.

93.     Because of the Defendant's discriminatory actions, refusal to accommodate, constructive discharge, and retaliatory actions, Melendez was damaged and has suffered the loss of wages and benefits, humiliation, embarrassment, and other compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Melendez respectfully requests that this Court enter judgment in her favor and against the Defendant and requests that the Court:

A.      Declare, decree, and adjudge that the Defendant has violated the ADA;

B.      Grant an injunction against the Defendant and its officers, managers, and supervisors from violating the ADA and protecting Melendez;

C.      Enter appropriate injunctive relief against the Defendant and its officers, managers, and supervisors to comply with the ADA and refrain from discriminating against and retaliating against and failing to accommodate her and interfering with her rights and protections under the ADA and awarding appropriate injunctive relief;

D.      Awarding Melendez back pay, front pay, and other employment benefits she was denied or lost;

E.      Order the Defendant to pay compensatory and punitive damages in an amount sufficient to punish the Defendant for its past discrimination and to deter it from continuing with its unlawful practices;

F.      Award pre-judgment and post-judgment interest;

G.      Award Melendez her reasonable attorney's fees and costs; and

H.      Award such other, additional and further relief as the Court deems appropriate under the circumstances, including nominal damages.

## COUNT VI (FAMILY MEDICAL LEAVE ACT

94.  Paragraphs 1 to 5, 51-57, and 65-81 are re-alleged and incorporated as though fully set forth herein.

95. In 2016 and 2017 the Defendant was an employer within the meaning of the FMLA, 29 U.S.C. #2601, and was an employer either engaged in interstate commerce or an activity affecting commerce, employed more than fifty employees in Chicago, Illinois, and it was an employer subject to the FMLA.

96. In 2017 Melendez was an employee of the Defendant within the meaning of the FMLA and eligible to receive FMLA benefits. As of July 3, 2017 she had more than 1,250 hours of service within the prior twelve months and had more than twelve months of service, she was eligible to take an FMLA leave of absence and she qualified for FMLA leave, and she able to perform the essential duties of her job.

97. Melendez requested that her absences between July 3, 2017 and July 9, 2017 be designated as FMLA leave. The Defendant denied Melendez's request to designate her absences between July 3, 2017 and July 9, 2017 as FMLA leave.

98. In July and August 2017 Melendez received multiple treatments by a health care provider involving the fracture to her right big toe, and she had a period of incapacity of more than three consecutive full calendar days.

99. Melendez's absence between July 4 and July 9, 2017 qualified as continuing treatment by a health care provider within the meaning of the FMLA. Melendez qualified for FMLA leave because she received multiple treatments by a health care provider involving a condition that would likely result in a period of incapacity of more than three consecutive full calendar days in the absence of medical intervention or treatment.

100. In July 2017 the Defendant was aware that Melendez had received multiple treatments by a health care provider involving a condition that would likely result in a period of incapacity of more than three consecutive full calendar days in the absence of medical intervention or treatment.

101. In July 2017 Melendez had a period of incapacity of more than three consecutive, full calendar days and subsequent treatment or period of incapacity relating to that same condition involving both treatment two or more times, within 30 days of the first day of incapacity by a health care provider and treatment by a health care provider on at least one occasion, which resulted in a regimen of continuing treatment under the supervision of the health care provider, and in July 2017 the Defendant was aware of facts confirming that medical treatment.

102. As of July 3, 4, 5, 6, 7, 8, 9, and 10, 2017 Melendez had a serious health condition within the meaning of the FMLA. Melendez notified the Defendant that she had a serious health condition, and requested a FMLA protected leave, and Defendant had enough information on July 7th to be aware that Melendez was under continuing treatment by a health care provider to qualify for FMLA leave.

103. Defendant knew that Melendez requested FMLA leave between July 3 and 9, 2017. Defendant denied Melendez her right to take FMLA leave during that period of time and suspended her for two days without pay. By denying her FMLA leave and suspending her without pay for two days, the Defendant interfered with, discriminated against, and retaliated against Melendez based on her FMLA protected leave, her request to take FMLA leave, and based on Melendez's alleged pattern of FMLA absences.

104. The Defendant's actions violated the FMLA and interfered with Melendez's exercise of her FMLA rights, retaliated against her for asking for a FMLA leave of absence, and jeopardized her ability to be transferred to a first shift job in October 2017.

105. The Defendant interfered with and retaliated against her in violation of the FMLA because she exercised or attempted to exercise her FMLA rights.

106.   Melendez has been damaged as a result of Defendant's acts.   As a result of Defendant's conduct, she has suffered and will continue to suffer the loss of wages, benefits, and other damages in violation of the FMLA.

107.   The Defendant willfully violated the FMLA by denying her her FMLA rights, interfering with her FMLA rights, suspending her without pay, denying her a transfer to the first shift, constructively discharging her, and retaliating and discriminating against her.

108.   Defendant knew or showed reckless disregard whether its conduct towards Melendez was prohibited by the FMLA.

## PRAYER FOR RELIEF

WHEREFORE, Melendez respectfully requests this Court enter an order as follows:

A.   That the court declare that Defendant's conduct complained of herein to be in violation of Plaintiff's rights as secured by the FMLA;

B.   That the court permanently enjoin the Defendant from violating the FMLA and from any conduct violating the Plaintiff's rights;

C.   That the court aware the Plaintiff liquidated damages;

D.   That the court order the Defendant to make whole the Plaintiff by providing her appropriate lost earnings and benefits with pre-judgment and post-judgment interest, and other affirmative relief, including back pay and front pay;

E.   That the court award the Plaintiff attorneys fees and costs incurred in prosecuting this action; and

F.   That the court award the Plaintiff such additional and further relief as it deems just and equitable, including nominal damages.

## COUNT VII (ADEA CLAIM)

109. Paragraphs 1 to 5, 51 to 57, and 65 to 81 are re-alleged and incorporated as though fully set forth

## PROCEDURAL BACKGROUND

110. On November 6, 2017 Melendez filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging violations of the ADEA. Melendez timely filed her Charge of Discrimination against Defendant with the EEOC alleging violations of the ADEA.

111. The EEOC Charge of Discrimination that Plaintiff Melendez filed was cross-filed with the Illinois Department of Human Rights. The Charge of Discrimination that Plaintiff Melendez filed was timely filed with the Illinois Department of Human Rights.

112. On April 11, 2018, the EEOC issued Plaintiff Melendez a Notice of Right to Sue with respect to her pending Charge of Discrimination that was filed against Defendant. A true and correct copy of the EEOC Notice is attached hereto as Exhibit B and incorporated herein.

113. This action has been timely filed by Plaintiff Melendez within ninety (90) days of her receipt of the EEOC's Notice of Right to Sue. Pursuant to 29 U.S.C. #633(b), Melendez has filed this cause more than sixty days after she filed a Charge of Discrimination with the EEOC.

114. Plaintiff Melendez has fulfilled all conditions precedent to the institution of this lawsuit against the Defendant under the ADEA.

115. Since at least 2015 the Defendant has been an employer engaged in interstate commerce or an activity affecting commerce, and it was an "employer" within the meaning of the ADEA. The Defendant was also an employer within the meaning of 29 U.S.C. #630(b), 630(g), and 630(h) of the ADEA. The Plaintiff Melendez was at all pertinent times an "employee" within

the meaning of the ADEA and entitled to the protections of the ADEA. Since at least January 1, 2015, the Defendant has employed more than twenty (20) employees within the meaning of the ADEA.

## FACTUAL BACKGROUND

116. Melendez was born on December 24, 1959, and as of July 1, 2017 she was 58 years old. As of July 1, 2017 Defendant and Tavrides were aware that Melendez's age was in her mid- to late fifties

117. Mercedes Garcia was hired by the Defendant on October 15, 2013. Garcia was substantially younger than Melendez. Garcia was approximately 35 years old.

118. At the time Garcia was selected for transfer in October 2017, Melendez had approximately sixteen (16) years of seniority as a Registration Associate, Melendez had a hire date of April 16, 2001, Garcia had approximately four (4) years of seniority as a Registration Associate, and Garcia had a hire date of October 15, 2013.

119. On October 27, 2017 the Defendant constructively discharged Melendez. A reasonable employee in her place would have felt compelled to quit. Melendez was forced to resign because her working conditions, from the standpoint of a reasonable employee, had become unbearable.

120. Younger employees, including Mercedes Garcia, were treated in a more favorable manner with respect to their terms and conditions of employment and regarding their transfers and discipline actions that they were given than Melendez.

121. Melendez complained about being subjected to discriminatory treatment and discriminatory terms and conditions of employment because of her age to Tavrides and the Defendant.

122.   In retaliation for her complaints about age discrimination, the Defendant retaliated against Melendez, including subjecting her to different terms and conditions of employment, denying her a transfer, and constructively discharging her.

123.   The Defendant engaged in unlawful employment practices involving employment discrimination and retaliation in violation of the ADEA.

124.    The Defendant's practices have deprived Melendez of equal employment opportunities and adversely affected her status as an employee because of her age.

125.   The unlawful employment practices complained of above were taken because of Melendez's age and in retaliation for her earlier complaints about age discrimination and were and are willful within the meaning of the ADEA.

126.   The Defendant's acts of discrimination and retaliation were taken knowingly and in reckless disregard of Melendez's rights and constituted willful violations of the ADEA.

127. As a result of the Defendant's discrimination and retaliation, Melendez has suffered and will continue to suffer the loss of wages, benefits, and other damages.


### PRAYER FOR RELIEF

WHEREFORE, Melendez respectfully requests this Court enter an order as follows:

A.  That the court declare that Defendant's conduct complained of herein to be in violation of Melendez's rights as secured by the ADEA;

B.  That the court permanently enjoin the Defendant from violating the ADEA and from any conduct violating Melendez's rights;

C.  That the court award Melendez liquidated damages;

D. That the court order the Defendant to make whole Melendez by providing her appropriate lost earnings and benefits with pre-judgment and post-judgment interest, and other affirmative relief, including back pay and front pay;

E. That the court award Melendez attorney's fees and costs incurred in prosecuting this action; and

F. That the court award Melendez such additional and further relief as it deems just and equitable, including nominal damages.

## JURY TRIAL DEMAND

A jury trial is demanded on all counts which are triable by a jury.

Dated: April 20, 2018

_____*s/ Marty Denis*_____
Marty Denis
Barlow, Kobata & Denis LLP
525 West Monroe, Suite 2360
Chicago, Illinois 60661
(312) 648-5570

*Attorneys for Plaintiff Maria Melendez and Mayra Hernandez*